Judith L'Enquist, Counsel for Plaintiff and Appellant Ministerial Exception. How do you fit your case within Bollard between the sexual harassment allegations, then moving on to retaliation, where it seems awfully clear that wherever one crosses the line into the decision-making process of the church, even Bollard wouldn't support a claim? Your claim goes for injunctive relief. Your claim goes into the reasons and the rationale for denial of future employment and current employment. Why aren't those clearly barred by the ministerial exception, as if you could address that? And then, as the amicus argues, the Women's Law Center argues, what is your argument that at least the sexual harassment claims do need to look at the two claims separately? Because the sexual harassment claim, we believe, clearly fits within all fours of Bollard. It does not involve a religious principle. In other words, it's not a church believing that sexual harassment is God's will. And it does not involve the core decision-making of selecting or firing an employee. But it does involve the decision of the church, correct? But not every decision of a church is exempt from coverage by the laws of general application. Well, here the responsibility of the church for sexual harassment is not derivative, is it? No, under Farragher. It depends on what the church did. Under Farragher, because the man who is alleged to be the harasser is essentially the CEO of this corporation, it is vicarious liability imposed on the church. So then the question becomes, did the church take effective and remedial action? And that's the point. So then you penetrate the decision-making process of the church. Well, I don't believe so. It's no more a penetration. I'm sorry, Your Honor. Finish your question. No. Go ahead. It's no more a penetration of the decision in this case than it is, say, in a pedophile case, where the court routinely allows civil actions to be brought against the church for accosting young parishioners. So there is a scope of decision-making that is not sacrosanct under the First Amendment. And what is sacrosanct are decisions of selecting the minister, and that's not an issue here, of defrocking the minister, which is not an issue here, of discharging the minister, which is not an issue here. It is on retaliation. Well, no, because the retaliation claim is closely parsed not to the decision to discharge. We're not contending that the church violated Title VII by discharging Reverend Elvig. What we are contending is that by withholding permission to circulate her resume, they are retaliating against her. Isn't that the same thing, though? I mean, if you're saying, we're not saying they have to keep her as a religious leader, but we're saying we get damages if they don't. Okay. That seems to me that you're, on that issue at least, on retaliation, that you're crossing into the area of the church's selection of its religious leader. Well, and I will acknowledge it's a closer question as to the retaliation. Unfortunately, the court below, in a broad swath, just dismissed the entire case, didn't leave the sexual harassment claim, dismissed both. I understand that. Well, Judge Rothstein distinguished Bollard on a number of grounds which may or may not carry the day. That's what we have to assess on the gender discrimination. The question as to the retaliation, the circulation of the PIF, which is not a decision to hire or fire. So I would argue, there alone, Bollard applies. Isn't that a difference without a distinction in the context of what we're talking about? No, I don't think so, Your Honor, because the question of circulating her PIF is a question that the Calvin Presbyterian is prohibiting another church from making. But they have, isn't that within their authority and power to do that in the first place? I mean, that's a distinction. So if you look at the Book of Order, and here's a proof problem. Now, they have raised this as an affirmative defense. If you look at the Book of Order, it says that they can only do it if charges are brought against Reverend Elvig. There were no on the face, the court has to accept the facts as pleaded, there are no charges brought. So the court doesn't even need to get into the merits of what the charges are merely on its face to say no charges have been brought. So now you're pulling us into whether they're following the Book of Order. On its face. But the court often has to look at burdens of proof and determine whether or not the church has proved its case. Aren't you asking us to adjudge whether the church has followed the Book of Order or not? No, simply whether or not there was a good faith reason for what it did. That's the burden under retaliation. So whether the church had a good faith reason. Correct. With the emphasis on good and not on faith? I'm sorry? With the emphasis on good and not on faith? Correct, Your Honor. Let me, I want to frame another question for you. Part of this case that's troubling me. And I'll just kind of lay out the parts that I think aren't troubling me and then the part that is. It seems to me that on the one hand that it's an entanglement if we get into whether they let Elvig be a religious leader or circulator piff. And I know you've got a different argument on that, but that seems to me the way I'm looking at it. Conversely, it seems to me that you have an ability to make a claim against Mr. Eccles, is that his name? Reverend Eccles, correct. Against him for harassment without creating an entanglement. No, because under federal Title VII law, you can't, there's no individual liability for the harasser. Under Washington state law. Title VII, I understand that. But under state law, you could have a claim against him that wouldn't entangle him. Well, you might accept that the Washington law against discrimination has a blanket exemption for religious institution. Here's my, here's part of what I would like to hear you address. For the church to be liable vicariously for what he does as a supervisor, they have to, the problem I'm having, if it were a private employer, we'd be looking at the L-Earth defense, right? Correct. And the question I have is, well, in this case, I don't see how we can look at an L-Earth defense without entangling ourselves in religious doctrine. Is their procedure for disciplining a priest reasonable or not? So then, I don't know, where does that leave you? Does it leave you that that's too bad for them because they don't have to assert an L-Earth defense? They can just be liable? Or does it leave us that there can't be liability of the religious institution because that would be discriminating against them compared to private companies? Right. Actually, I misspoke. I believe it's Farragut that would be applied. Farragut. Farragut, of course, under the McDonnell Douglas standard, the plaintiff would first have to prove that there was sexual harassment, and it was committed by a supervisor manager, which clearly is admitted for purposes of this case. Then the burden turns to the defendant, not to prove, but simply to come forward with evidence that they took prompt and effective remedial action. But don't they have to say we have a reasonable policy against discrimination and we took reasonable action? No, it's not. That's L-Earth. Okay. Farragut says that they simply have to show, and they don't have to prove. They just have to come. It's a burden of coming forward, that they have a policy that they took. Strike that. That they took effective remedial action to cease or to curtail or interrupt the sexual harassment. That's the inaction that Bollard talks about. You have to show that they did not, right? I mean, you have to visit some wrongdoing on the church itself, not just wrongdoing on the harasser. No. Under L-Earth, it's vicarious liability. You show that the CEO of the corporation committed the sexual harassment, and you've established your prima facie case. But what's bothering me about that L-Earth theory against the church is that the church is going to get the benefit of the affirmative defense. Well, it's why not? They can come forward. Because we can't assess the affirmative defense without entangling ourselves in their disciplinary procedures. But it's undisputed they took no action. On the facts in this case, it's undisputed. They took no action after they reviewed it. But whether they were, you know, had some reasonable procedure, I don't know how we can. But under L-Earth, what is available to them, and I believe L-Earth, the reason L-Earth is set up the way it is was because the Supreme Court wanted to end sexual harassment. Well, don't we necessarily have to get into why they took no action, as you describe it, and determine whether they had a basis to do that? And that's the part that seems to get into the decision-making process of the church. Well, they have to get into why they did it. They would have to come forward and say, we believed it didn't happen. I mean, that's basically their defense here. And that's sufficient? That would be sufficient. Then the plaintiff would have to show that it did happen. But then, okay, so then the litigation as it proceeds, because one of the issues under Bollard is the entanglement, is the scope of discovery, the scope of the litigation. How does the case proceed without trenching the internal actions of the church? Well, it's within the discretion of the trial court to limit discovery. And so to the extent that discovery can be limited to hands-off the ecclesiastical process. But don't you necessarily go right into the ecclesiastical process when they say we had a good reason and you're claiming, no, they didn't? Then you're litigating the decision-making process of the church. No. And you have to have a discussion with the refusal to circulate the PIF, aren't you? Well, let's leave the PIF aside for a moment because we're on the sexual harassment case, Judge Stroud. The evidence would simply be that from the plaintiff's perspective, to meet the McDonnell-Douglas test, we would show that Mr. Reverend Ackles was essentially the CEO, in other words, he was a high-ranking supervisor, and that Reverend Albeck was sexually harassed within the standard under the Title VII case law. And then that would be our burden of moving a crime-invasion case. They come forward and say we didn't believe sexual harassment took place. And then we would come forward and say no, we would come forward and say they took no action. And if the case is over? Yeah. And then it goes to the jury. We had a reason for taking no action. They can't say that? They certainly can say that. And then you're saying it's baloney. And so that's the point. You're dragged right into the decision-making process of the Church involving an election. Well, it's no different than the Court was grappling with in Bollard. In Bollard, there was inaction. In this case, there's inaction. And this Court, this Circuit said that the minimal entanglement does not trump the broad policy of Title VII. Yes, there's entanglement. Was Bollard a minister? For purposes of the Court's decision, yes. They keep referring to him as a minister. There's nowhere in the Bollard decision that the Court refers to this gentleman as other than a minister. And with respect, there is another thought that I would like to put forward on the retaliation claim. The retaliation claim, the whole issue of circulating her pimp is a mitigation issue brought into the case because the Church used it as an affirmative defense. One way to handle the retaliation claim would be simply to allow it to go forward without allowing the Church to raise mitigation as a defense. Then we wouldn't have to get into that particular issue of retaliation. The retaliation would be the kinds of activities that they took once they found out that she had filed a complaint and whether or not that gives rise to damages. So that is one way of crafting the case to allow both issues to go forward to the jury. Okay. I have another question for you. It's a very difficult area, so I appreciate your advice on this. Bollard seems to limit the ministerial exception to protecting religiously motivated conduct or a decision that has to do with hiring or firing who the religious leaders are. My question is whether that exhausts all issues that we could consider with Bollard. Assuming that Bollard would narrowly limit a ministerial exception so that it didn't provide protection in this case, is there still an area in which we have to consider whether the conduct of a trial would lead to entanglements, whether we call it something that maybe aren't a ministerial exception but some other kind of prohibited entanglement? I believe not, Your Honor. I believe that the Bollard decision is rightly decided under the Establishment Clause, because any further expansion of the ministerial exception would establish religion and possibly create an equal protection violation, because you are exempting religious institutions from coverage, whereas other employers are not similarly exempted. So I think you have to parse it very fine in order to preserve the First Amendment freedoms, while at the same time enhancing the high public policy that this Court and the Supreme Court of the United States has said Title VII seeks to address. Okay. Thanks. Another thing that's been bothering me is, is there no claim that can be made against the senior priest, Mr. Ackles? Yes. Can there be a claim against him under State law? There possibly could be a sexual battery charge against him. But this is not a physical assault. Are you saying Title VII wouldn't cover him because he's not the employer? Correct. And you're saying that the WLAD doesn't cover him because of an exception? The 4960 exempts all religious institutions for all kinds of discrimination. And individuals in them as well? That's the question that's pending before the State supreme court right now. So the State supreme court is considering whether, is it just the church that's exempt, or is it also the priest? Right. The 4960, the retaliation provision and the aiding and abetting provision under 4960 uses the term employers and other persons. And we're making the claim that Reverend Ackles is a, quote, other person. The church has defended in that case saying, no, they're part of the employer. It's under one penumbra. It gets dismissed. And is that a case? Is that one of our cases certified to the State supreme court? No, Your Honor. When Judge Rothstein dismissed the pendent State claims, we brought them in State court. I see. The church moved to dismiss there the court, the trial court. But that's pending there in this same dispute. We've taken a direct review to the supreme court. I'd like to save the rest of my time for rebuttal. Thank you, Counsel. We'll hear from the other side. Your Honor, I'm Betsy Reeve, and I represent Kelvin Presbyterian Church, the Presbytery, and Reverend Ackles. Also present today are David Powell on behalf of Reverend Ackles, who is not present. He's on sabbatical in Ethiopia. Reverend Gail Neal from the Presbytery, and Paul Burks, who represents Amicus, and to whom I'm yielding eight minutes of my time. This case should be dismissed on constitutional grounds. And the Court has recognized one of the key distinctions between this case and the broader case in that Kelvin Presbyterian Church and the Presbytery made decisions in this case that the courts cannot adjudicate. Well, how do you – what would be the position of the church, just so I understand the ramifications of your argument? If, in fact, this was a – I resist the analogy to what just went on in California, but let's suppose that Reverend Ackles had actually engaged in physical groping and clearly overt conduct that, let's for purposes of rule in or rule out criminal behavior, but let's suppose that he had actually physically touched Reverend Ackles. And what would be the church's position? Is that that's unreviewable under Title VII? Well, presumably the church's decision would have been different in that situation. We're assuming that it isn't, because in this case, as in Ballard, one would assume so, but in fact, on the allegations in Ballard, there was actual physical sexual abuse. So given my hypothetical, is the church saying that even if the allegations were that there had been physical touching of the woman, is it your position that that's unreviewable under Title VII? When you look at the United States Supreme Court precedent, yes, that is the result that would flow from that, because the United States Supreme Court has basically said when the church has rendered a decision and it has the power to do that, that decision is unreviewable by the courts. Well, what about Smith? I mean, Smith says that the church is not exempt from initial law. I mean, it said that, you know, churches aren't sacrosanct for laws of general application. So where is it that says that an actual sexual physical assault is exempt? Smith? It's not the church's doctrine to tolerate that. It wouldn't be the church's doctrine. That's correct. That they would tolerate it? No, it would not be the church's doctrine that they would tolerate sexual harassment. In fact, they disavow sexual harassment. So in that sense, you're just like the Jesuits in Ballard. Yes. The church disavows this kind of behavior that I've hypothesized. I'm not saying it's in this case. It's not part of the doctrine. So now you just have a question of physical sexual assault against a woman, and what is it in the Constitution, what constitutional case do you rely upon to say that that is overrides and exempts the church from the clear mandate of protecting women against that kind of abuse? I have two responses to that. First, the cases that you ask for are the Supreme Court cases that say when a church makes decisions, not only on ecclesiastical rule, custom, and law, but also on issues involving internal governance, church administration, and management of internal affairs, those decisions cannot be adjudicated by the courts. I accept those. Right. What's the case that's like sexual harassment? There is no United States Supreme Court case like this, but there are certainly cases that don't address just church doctrine, that indeed address church administration, and that goes to the second response. Both Smith and Ballard involve that portion of the free exercise clause that there really are two components to the free exercise clause. There's that component, and there's the component that gives churches the freedom to manage the internal affairs of the church unfettered by court intrusion. Well, how does that square in with Ballard? Because that second element never arose in Ballard. In Ballard, the court looked just at whether there was religious justification for sexual harassment, that first element, or the first component of the free exercise clause. They never had to address the second component of the free exercise clause because of the factual distinctions between this case and Ballard, because Ballard never was an ordained priest. He never took those vows, and the vows are really critical in this situation, because Reverend Elvig's vows, she agreed that she would be bound by the polity of the church, the governance of the church, those exact things that the U.S. Supreme Court is referring to, and she agreed to abide by its discipline. Okay, I hear you, and I just want to make sure we're staying on my hypothetical. So you're saying that it's the church's view that a woman who becomes a minister in the church gives up her right to complain about sexual harassment? No, she is not giving up her right to complain. She still possesses the right to complain within the church structure to which she has agreed to be bound. Her remedy is within the church. And if that sexual misconduct rose to the level of a criminal offense, what's your position? Well, one, she'd have recourse to the criminal arena as well. But, yes, her vows would still apply. But she, as a matter of fact, has yielded. Is she exempt? Yes. She has yielded jurisdiction to the court. And just as ministers can relinquish very personal rights when they make their vows, vows of poverty, silence, celibacy, they can also relinquish legal rights. But are we supposed to weigh the – are we really competent to evaluate the significance of a religious vow? Let's say that some church, a different church, had some guiding principle that all members had to agree to submit all personal disputes, personal injury or contract disputes had to be submitted to some ecclesiastical process. So two members get in a contract fight. They submit it to the church court. Non-incident, yeah. And the court makes some ruling. Does that mean that there'd be no jurisdiction in any state or federal court on the contract? That is outside that group of decisions that the United States Supreme Court protects, the sanctity of the decisions. Because they do say it has to be – They do say the sanctity of who you choose as a religious leader, how you manage your church. How you manage the internal affairs of your church. How you decide disputes. Why should that extend to how you review whether some person working for you has been assaulted by another person? Because that's a dispute between two ministers. You have one minister accusing the other of behavior that violates church doctrine, church religious beliefs. And she has vowed in her ordination vows that those kinds of disputes can be governed by the church. And the U.S. Supreme Court – You think it would be a totally different case if it was a priest secretary who claimed abuse? Lay employees are a totally different situation. Do you think Ballard was a lay employee? Well, when you read the court's decision, they don't really specifically say. They discuss the ministerial exception. They recognize that he was a novitiate. He was not yet ordained. And they analogize it in many circumstances to lay employees. Right. And they say, this case, we will analyze this case as in the case of lay employees. Elsewhere in the court, they talk about a minister being the target of harassment. So it's not entirely clear. But regardless, the court doesn't address what his vows would have been and how they would have bound him to the internal governing structure of the church. And there is that component of the pre-exercise clause that gives churches autonomy. And there are – the Tenth Circuit has said that that broader autonomy doctrine even is broader than the ministerial exception. And in this case, Ballard didn't address the autonomy of the church because the facts weren't there as they're squarely before you. Okay. Well, we're bound by – I assume we're bound by Ballard's definition of the scope of the ministerial exception. Are there other areas of entanglement under the Establishment Clause that are relevant apart from ministerial exception, or is that exhausted? And is there – what I seem to hear you say now, is there some free-exercise autonomy right of a church that would be infringed? Yes. I think Ballard just began to define the scope of the ministerial exception. And it didn't have to reach the issues here of what is the scope of the autonomy doctrine under the free-exercise clause and what is the sanctity given to church decisions. Is the ministerial exception grounded in the free-exercise clause or the Establishment Clause? Or both. Both? Both. Has the Supreme Court said that? I can't cite a case. What has the Supreme Court told us about the ministerial exception? It's primarily a creature of the Circuit Court of Appeals, beginning with the McClure case in the Fifth Circuit, which was not a case involving selection of ministers. It was a church governance internal management case as well. And they said just church governance invokes the ministerial exception. Would there be any problem if we were to sever the claims, bifurcate them, as you might call them, and allow the hostile work environment claim to go forward? You still have both establishment problems and free-exercise problems. When you look at the cause of action of sexual harassment, it necessarily addresses in the affirmative defense the reasonableness of the church's policies and the reasonableness of the action they took. And they took affirmative, formal action not to discipline Reverend Ackles. So, indeed, the sexual harassment claim caused the same problem. So you necessarily get pulled in the litigation of the affirmative defense, and that brings the church's internal decision-making into the court. So how can the church then take the position that no claim could be made against the priest who's alleged to have done that? I'm sorry? Is it Ackles? Yes, Reverend Ackles. Will Ackles. Yes. Okay. So in the State court claim, is the church taking the position that there can be no claim against Reverend Ackles? Yes. In the State court, the claim against Reverend Ackles was dismissed, and it was based on free exercise. Well, I presume the judge based it on both free exercise but also entanglement problems. I am yielding my time to amicus, and my time is up. Thank you. Thank you. Thank you, Your Honor. Paul Burks from Kirkpatrick and Lockhart on behalf of amicus. Could you keep your voice up, please? Certainly. And who's your client again? Amicus Presbyterian Church, USA, in the Sinai of Alaska Northwest. As my co-counsel has stated, the plaintiff in this case is an ordained minister in the church. She's made an accusation against another ordained minister of the church, which implicates the relationship between two members of the church hierarchy. That accusation was adjudicated by the internal procedures of the church, and now plaintiff would seek to raise the same accusation in Federal court. And as co-counsel has stated, we believe the church autonomy doctrine is broad enough that this type of a claim implicates the church's internal procedures, its internal government, and it really cannot be heard in Federal court. Could you explain how it implicates it? What would be involved, as you see, in playing out the litigation? Certainly. Particularly moving sort of up a level of abstraction to the hypothesis I pose where this moves beyond verbal conduct and would encompass as well alleged physical assault. Certainly. I'll give one example of the first question, ecclesiastical question that I believe the district court would have to answer in pursuing this claim if this court decides the claim should go forward. And that is, what is the legal effect of Reverend Elvig's vows? Judge Gould said earlier, can we really assess that? And really you can't. And the question becomes, are those vows binding in a Federal court? Is she bound to abide by the church polity? And if perhaps a district court were to determine applying some neutral principles of law that those vows are not enforceable, that those vows don't satisfy the statute of frauds or there's no consideration, then the question becomes for the church to look at their ordination process and to say, Title VII claims by ministers against the church can go forward. The vows do not preclude those claims from going forward because they're not enforceable, yet this Court just last week held en banc that an employer could condition employment on an arbitration agreement to arbitrate Title VII claims. So the church now looks at these legal decisions. You're talking about loose forward? I am. I'm sorry. I'm talking about loose forward, the en banc decision in the Ninth Circuit that said an employer could condition employment on an employee's agreement to arbitrate Title VII claims. So now a church looking at these decisions says, these Title VII claims can go forward. The vows aren't sufficient. Perhaps we should change our ordination process to include a written arbitration agreement. And then the church is making ecclesiastical decisions, who should be their minister, based on what is going to be viable in the federal course. And that's an infringement of their free exercise rights. That's an infringement of the church autonomy doctrine, which enables them to choose their ministers based on the criteria that they deem are sufficient. So basically what you're saying is that a woman minister, by signing the vows of the church, waives any claim for overt physical sexual harassment? I'm saying that the claim is within the jurisdiction of the church. And I believe that a minister, a member of the leadership of the church, and I think Rayburn and McClure have some very persuasive language on what the role of a minister in a church is. Rayburn says the lifeblood of the church, the representative of the church. I don't understand what a minister is. I'm just looking to the implications of your doctrine. I'm sorry, Your Honor. If a minister of the church is within the jurisdiction of the church because of that role and because of her vows, then she does give up the right to go to federal court with civil claims. Are you asking us to hold that in an opinion? Excuse me? Are you asking us to hold that in an opinion? You don't have to go that far. No, no, we don't need to go that far. I was just trying to respond to Judge Fischer's question, which was I think directly related to whether or not the vows alone are sufficient to remove Judge Fischer from court. That doesn't seem to be the argument of the church, is that the reason you distinguish Ballard in part is because there is the vow. Well, it is that she's a minister, and the vows are part of her being ordained to a minister was the agreement of the vows. I understand that, but I don't understand your response to Judge Trott's question then. If the argument of your co-counsel is that the key distinction between the novitiate in Ballard and Reverend Elvig is the vows, and the vows basically, and you've argued they're analogous to the loose forward agreement, how do we stay away? We're supposed to distinguish Ballard on some other basis? No, I think that that is the key distinction with Ballard, the other being the procedures that the presbytery went through in this case. Well, can we rule based on the fact that one church has more procedures than another church? I mean, does that discriminate in favor of religion or endorse religion if we do that? One church has an extensive ecclesiastical process. Let's say another church doesn't. Does that mean the one that has a more formal process gets a ministerial exception and the other one doesn't? Well, the problem you run into with the church that has the extensive ecclesiastical procedures is the entanglement problem, is reviewing those procedures. And so you may not run into that problem if the church – you may not – I'm sorry, Your Honor. You may not run into that problem if the church didn't have procedures, but you would run into another problem, which is why doesn't the church have procedures? For example, I'm twisting theology. The pope says you don't get any relief. That would be the – there would be no procedures there, but you would have the doctrinal basis for no procedures, and you would run into that second problem, which is challenging a doctrinal belief of the church. But that's not the case here, right? No. We have procedures. So why wouldn't that be an adequate defense to a Title VII claim? That's how it comes in. You have procedures. They were followed. That's the end of the story. We have procedures that were followed, and we believe that that is the end of the story. So – but why doesn't that get adjudicated in a normal Title VII context? I don't understand where the doctrine comes in. Again, I'm afraid I misspoke. It was in response to the hypothetical of a church that does not have any procedures. I understand you have procedures. Okay. Where does the doctrine come in? I mean, why – as counsel for Reverend Eldred has said, in a Title VII case, your defense is, we took reasonable steps. We have procedures. We followed them. End of story. Because then the plaintiff's burden would then be to show that those procedures were a pretext, that we didn't actually follow our procedures, and that would entangle the court into actually looking at the good faith of our procedures and whether or not they were followed. I think actually the Supreme Court case of Milovojevic is on point here, because in that case the Illinois Supreme Court actually looked at the procedures followed by the Serbian Orthodox Church and said, you didn't follow your own procedures here, so your decision was arbitrary. Well, that was clearly a dispute between who had the right to the church. That was very internal. We believe this one is internal as well, because of the two ministers and the church. Everyone on both sides of the V in this case is a minister representative of the church, and that's an internal dispute. Again, doctrinally, sexual harassment I know is not part of your church's doctrine. Absolutely not. Remedy under Title VII. Okay. How do you deal with Bollard? This may take you 30 seconds over your time, but basically Bollard seems to say that the ministerial exception will apply to protect religiously motivated conduct, which is not involved here, and hiring and firing or discipline or hiring and firing on who you choose to be a minister. So how does reviewing whether one minister harassed another sexually fall into either of those categories? If it doesn't, is there some other category that needs to be added to what Bollard talked about? I think there is a third category that needs to be added, and that can be called internal church governance, internal disputes, church administration, and I think where you have two ministers involved in a dispute that also implicates the church, Bollard didn't have that fact situation in front of it, and so it didn't address this third category, this church government category. Are we as a panel free to say there's a third category that Bollard didn't articulate? I think even more than free to say it, I think the Supreme Court has said it.  the church governance in Cedrov and in the Serbian church, Milojovich, which is the church governance and internal church procedures, are also protected by the Church Autonomy doctrine. And that strain of Supreme Court precedent was not implicated by Bollard. They didn't address it, and they only addressed these two other aspects that are also protected. Thank you, counsel. Let me respond. The third prong of the McDonnell-Douglas test is not were the procedures reasonable. The third prong of the McDonnell-Douglas test is did it stop the sexual harassment? Was it geared to stop or interrupt the sexual harassment? That's factual. That's not doctrinal. Well, here's the problem I have with your position. It seems to me the other side says necessarily when we come forward and explain why we didn't do anything, to use your terminology, then you're going to say, well, that's malarkey and that whole decision-making process involving the internal governments then gets pulled onto the litigation table in a Federal court. Doesn't that necessarily happen under this circumstance? That's not what we would say. We would say to the jury, did that stop the sexual harassment? Title VII says that when an employer is alerted, given notice, that sexual harassment has occurred. That's not what you would say. But the other side would say we had a very good reason for doing what we did. And you're going to be saying that reason is no good. I'm going to be saying that reason didn't stop it. Admit that they have this procedure, which, by the way, is, you know, they're relying on this procedure. It stops at the presbytery. She never got an opportunity to bring it to the full church. So, but I want to close by bringing the Court back to Bollard, because I think Bollard disposes of this case. And with respect to the entanglement, the Ninth Circuit said, Judge Fletcher wrote, that there are two types of entanglement. There's substantive entanglement and there's procedural entanglement. Substantive entanglement is where there is a church doctrine that is involved. That's not this case. There is no church doctrine. Well, I know, but how about the governance category that the other side points to? Well, that falls into the procedural entanglement. I apologize for interrupting your answer. I apologize for interrupting your question. It disables you from understanding my question. Okay. Go ahead. The Bollard case then says since in Bollard there is no substantive entanglement, we go to procedural entanglement, and that's like any other civil case in this situation. Now, Ms. Reeve, I think, misspoke in saying that the Court analyzed the facts on a lay principle. They didn't. There's nothing written into the Bollard decision that says they were treating Mr. Bollard as a layman. To the contrary. There's an awful lot of discussion about the difference between priest and layman. And they point out he had not yet become a priest. And they point out that the church was still encouraging to become a priest. So I think it's possible to distinguish Bollard on that ground. He had not yet become a priest. Here we have a minister who has become a priest minister. Well, I mean, obviously the Court has to read what the Bollard case says. I don't believe the Bollard case says that. We're dealing with a ministerial exception. Bollard is dealing with the ministerial exception. They're not dealing with the lay exception. They're dealing with a ministerial exception. Ergo, they're dealing with the issue of a minister. I don't agree with your ergo, but maybe I'm by myself. Well, I would ask this Court to look closely at this case. There are hundreds of thousands of women who want to be and are now currently serving in pastoral positions that this Court has the ability to extend Title VII's protection to or deny it. Thank you. Thank you, Counsel. Case just argued as ordered and submitted. We'll be in recess until tomorrow morning at 930. Thank you. Thank you.
judges: Trott, Fisher, Gould